48   273
70   335

H. C. REDDINGTON & Co. v. JAMES E. HENRY ET AL.

If the purchaser buys land, and advances his money in payment of the price, and demands such a deed as the contract calls for, and the vendor refuses to give it, but insists on his receiving a different and inferior title, the contract may be regarded as broken, and the purchaser may sue at once, and recover the money paid with interest.

Where the evidence of title is worthless, it need not be returned before action brought, but may be deposited with the clerk of the court, for the use of all in interest.

ASSUMPSIT for money had and money paid. Writ dated June 13, 1866.

The plaintiffs introduced a subscription book, the terms of which were as follows : " We, the undersigned, promise to take the number of shares set against our respective names, and to pay to James E. Henry and Charles C. Moulton the sum of one hundred dollars, ($100) for each and every share so subscribed. The said J. E. Henry and C. C. Moulton hereby obligate themselves to lease to each and every share-holder for the period of thirty years, his proportion of twenty-five shares of $100 each in the following described pieces or parcels of land situate in the township of Musa, county of Middlesex, Canada West, and being strips number one to four in lot 22, second range north, containing ten acres ; said leases to be given as soon as the full amount of twenty-five shares of $100 each, shall be subscribed. Littleton, N. H., November 20th, 1865."

Three witnesses were examined on the part of the plaintiffs, Cyrus Eastman, and the plaintiffs, Henry C. Reddington and George B. Reddington. Their testimony tended to prove the following facts : The plaintiffs signed ' the subscription book aforesaid for one share of $100, on or about the 21st of November, 1865, and on or before the 27th of the same month paid that sum to the defendants. On the 27th of that month the plaintiff and other subscribers met at J. Farr's office in Littleton, and chose a President, Secretary and Treasurer. The defendant Henry appeared at the meeting, stated that the twenty-five shares had been subscribed and paid for, and delivered the subscription book to the subscribers. The principal question considered at this meeting was whether a lease should be given to each subscriber, or one lease to one of them, to be held in trust for all, and it was decided to have one lease, and Cyrus Eastman was selected to take · it as trustee. Henry assented to this arrangement and said he had authority to execute the lease for Moulton, and was ready to give one then in his own and Moulton's name. But the subscribers preferred that the lease should be executed by Moulton himself. It was then arranged that a lease should be drawn running to Eastman, taken to Boston where Moulton then was, executed by him and Henry, and sent to Eastman at Littleton. It was understood that Evarts W. Farr, who was one of the subscribers, and has acted as counsel for the plaintiffs in this suit, and is one of the subscribers who have agreed to share in the expense of carrying on this suit, should make a draft of the lease. It was testified by the plaintiffs and Eastman that they understood Farr was to draw the lease for the defendants and as their attorney. There was no evidence that it was referred to Farr to decide on the form of the lease, except the fact that he was one of the subscribers.

Printed forms of leases, corresponding in form with that which was afterwards executed and tendered by the defendants, were brought into

this meeting by Henry and lay there on the table open to inspection; but they were not presented to the meeting as the form in which the lease was to be given, nor adopted or amended by the meeting, and the plaintiffs testified that they did not read or understand what the terms and conditions of the blanks were.

On the 28th of November, 1865, the draft of a lease was made at Littleton by E. W. Farr, taken to Boston, there executed by the defendants, and sent to Eastman at Littleton. The particular time when it was executed and sent to Eastman did not appear, but it was received by Eastman not many days after the 28th of November, 1865. Since the lease was received by Eastman the word " two " in this lease has been erased and the word " thirty " substituted by direction of the defendant Henry. A copy of the lease which is marked A, is to be made part of this case.

There was no evidence that any steps were taken by the subscribers in reference to the acceptance or rejection of the lease until the 9th of December, 1865, when Eastman presented the lease to a meeting of the subscribers, who then decided that they would not accept the lease, because as they said, it did not conform to the terms of the subscription. They objected generally that it did not agree with the terms of the subscription, but their principal objection appeared to be to the reservation of one fifth of the oil, which was called the *royalty*.

There was no evidence to show what notice, or that any notice, was given to the defendants of the action of the subscribers in rejecting the lease, till the 18th of December, 1865, when the defendant Henry was present with the plaintiff George B. Reddington, Cyrus Eastman and others, and Reddington and Eastman informed Henry that the lease was not sufficient, and that the subscribers would not accept it.

About the first of January, 1866, the defendant Henry met Cyrus Eastman, the plaintiff George B. Reddington, and other subscribers. At this meeting the subscribers insisted on their objections to the lease, and were told by Henry that the defendants could not obtain a release of the *royalty*, and could not give a lease without that reservation. It was then proposed that Henry should endeavor to sell one half of the ten acres for $2500, to be paid to the subscribers, and the subscribers proposed to take the $2500, and a lease of the other half on the terms of the lease which had been drawn, but it was stipulated that this arrangement should not affect the right of the subscribers to insist on a lease according to the terms of the subscription. Henry was to have about thirty days to negotiate the sale and Eastman offered to assist in obtaining a purchaser. Henry did not effect a sale, and about the end of February met the plaintiff George B. Reddington, and told him he could not then make a sale and wished the matter might rest a while, as he thought in the spring he could sell.

On the 11th of April, 1866, the plaintiff George B. Reddington, Cyrus Eastman, and other subscribers met the defendant Henry, and Reddington for the plaintiffs demanded a lease that would agree with the terms of the subscription. Eastman also demanded a like lease for himself and those whom he represented. Henry said it was out of his

power to give such a lease as was demanded; that he could not obtain a release of the *royalty*.

Eastman then asked Henry if he was willing to pay back the money to the subscribers. He said for his own part he was willing, but he could not answer for Moulton, who was then in Boston, and requested delay for the purpose of consulting with Moulton. There was no agreement to give him time, but he requested that a suit might not be commenced immediately, and was told that there would be no occasion for haste in suing. He then said he should be round in about two weeks, and in the mean time would write to Eastman.

On the second day of May, 1866, the plaintiff George B. Reddington and Eastman met the defendant Henry, and Henry told them he had been to Canada and could then give a lease according to the subscription. Reddington and Eastman told him it was then too late; that delay had not been given him for that purpose, but to obtain the money; that they wanted the money back. Henry then demanded the subscription book, which was refused, but he was offered a copy.

The subscription book, since it was delivered to the subscribers on the 27th of November, 1865, has remained in their possession, and has never been tendered to the defendants; the lease has also been in their possession, and has not been offered to the plaintiffs since it was received; but it has been altered, as before mentioned, by direction of Henry.

Before the 11th of April, 1866, the premises agreed to be leased had declined in saleable value, and at that time had no market value as oil lands. The plaintiffs took no measures to examine the land, and had no information in respect to it except what was derived from common report, and the representations of the defendants.

After the evidence on the part of the plaintiffs was concluded, the defendants moved for a nonsuit, and made the following exceptions to the case of the plaintiffs.

1. The lease furnished by the defendants to the plaintiffs was a compliance with the contract.

2. The action of the plaintiffs after the lease was furnished was an election to adhere to the contract.

3. The evidence shows no rescinding of the contract so that this action can be maintained.

4. The offer of the defendants to furnish a lease such as the plaintiffs had requested, was a compliance with the contract under the circumstances.

The court denied the motion for a nonsuit, whereupon a verdict was taken for the plaintiffs by consent, subject to the opinion of the court.

The questions arising on the foregoing case were reserved and transferred.

*H. & Geo. A. Bingham*, for defendants, referred the court to the following authorities in support of various positions by them assumed: Story on Conflict of Laws, 300; Bouvier's Law Dictionary, vol. 2, p. 16; Bacon's Abridg. Lease; Cruise's Digest, title 32, chap. 5; *Weeks v. Robie*, 42 N. H. 316; *Hunt v. Silk*, 5 East 449; *Conner* v.

*Henderson*, 15 Mass. 119; *Sanborn* v. *Osgood*, 16 N. H. 112; *Kimball* v. *Cunningham*, 4 N. H. 502; *Evans* v. *Gale*, 17 N. H. 573; *Coolidge* v. *Brigham*, 12 Me. 247; *Perley* v. *Balch*, 23 Pick. 243.

J. *Farr & Son*, and *Hibbard*, attorneys for plaintiffs, referred the court to the following cases : *Little* v. *Paddleford*, 13 N. H. 167; *Judson* v. *Waas*, 11 Johns. 525; *Clate* v. *Robinson*, 2 Johns. 595; *Line* v. *Stephenson*, 5 Bing. N. C. 183; *Frazer* v. *Sley*, 2 Chitty Rep. 646; *Barrett* v. *Lynch*, 5 B. & C. 589, 12 C. L. 327; *Webb* v. *Stone*, 24 N. H. 282; 12 N. H. 205; *Drew* v. *Claggett*, 39 N. H. 431; *Brown* v. *Mahurin*, 39 N. H. 156; *Hazeltine* v. *Batchelder*, 44 N. H. 40; *Jenkins* v. *Thompson*, 20 N. H. 457; *Gillett* v. *Mayard*, 5 Johns. 85; 1 Caines' Rep. 46; *Raymond* v. *Barnard*, 12 Johns. 274.

NESMITH, J. The original subscription paper, signed by the plaintiffs, and delivered to defendants, established the foundation of the contract between these parties. This was executed about the 21st of November, 1865. The plaintiffs having paid all the money which the terms of their contract required, the obligation was then cast upon the defendants to make and execute to them, together with the other shareholders, or associates, the several leases of the land for which they had paid, agreeably to the terms and fair intent of their said original bargain.

A fair construction of the language employed by the parties would seem to require of the defendants, the delivery of such a lease as would give to the plaintiffs, for the term of thirty years, a good title and free enjoyment of the said premises described in the subscription paper. The contract did not express or imply that the lessees should pay any more rent; the one hundred dollars being regarded in the nature of an advancement of plaintiffs' share of rent for the whole term. The past fulfilment of the contract would, therefore, require from the defendant a lease of the premises mentioned in said subscription paper, unincumbered by any claim of additional rent, or other like imposition, or any uncommon reservation, or new condition, or burthen of any kind whatsoever. The parties had a legal right to vary their contract by mutual agreement, so far as to substitute one joint lease for several; the covenants of the new lease to remain the same as originally provided. The lease, as prepared by the defendants, and furnished to the plaintiffs and their associates on the 9th day of December, 1865, was rejected by them, as not conforming to the original contract. Was this lease, which was then tendered to the lessees, such a one as they, as reasonable men, were bound to accept? On recurring to it, we learn that the leading object of this demise from the defendants was to enable the lessees to procure from the lands therein described, oil or petroleum, and other mineral productions lying in, on, or under the said premises, and for erecting necessary buildings for working and storing the products of this nature, and for other purposes connected therewith. We find also the following reservations incorporated into said lease : "Reserving to

the defendants, as lessors, the use and occupation of all such parts of the demised premises as shall not be required for the purposes aforesaid for agricultural purposes." Then again, we find another condition in the lease, that the said lessees shall pay to the lessors annually one shilling during said term ; and also the more important provision, which was cause of special objection by the lessees : "That they must deliver to the lessors one fifth part of all the oil, which the said lessees shall obtain from the demised premises during said term, or at the option of the lessees, they may pay to said lessors at the times stated in said lease, the cash value of said oil at the oil wells." This last provision is what is denominated the royalty, in the language of the case. Superadded to the three new provisions, the duration of the term of the lease, when presented to the lessees, was reduced to two years, but at some subsequent period of time, not stated when, Henry struck out two years and inserted thirty. As early as the 18th of December, 1865, Henry, one of the defendants, had notice from one of the plaintiffs, and Eastman, the agent of the lessees, that the lease was not sufficient, and that the subscribers, or lessees, would not accept it.

On the first day of January, A. D. 1866, the defendant Henry again met the subscribers, and informed them that he could not obtain a release of the royalty, and that they could not give a lease without that reservation. On the 11th day of April, the said Henry again informed the plaintiff, George B. Reddington, and Eastman, the agent, that it was out of his power to give such a lease as was demanded, as he could not obtain a release of the royalty ; and then the case finds that both Reddington and Eastman made at this time a special demand upon Henry for such a lease as should conform to the original contract, and also requested Henry to refund the money received by them towards the contract. The case shows that some other events subsequently transpired, not affecting materially the questions at issue between the parties.

Under the facts as here disclosed, we have no hesitation in arriving at the conclusion that the aforesaid provisions, which were incorporated into the lease, and not found in the subscription paper, were such material variances, conditions, burthens or incumbrances as furnished to the lessees sound and substantial reasons for refusing to accept the lease, as a fulfilment of the contract of the defendants, and, of course, furnished to the plaintiffs just cause for the rescission of their contract, and for demanding, and recovering back their money paid under it. The contract remained open and executory, to be fully completed by defendants, only by the delivery of such a lease as would conform to the original contract of the parties ; and when the final demand was made on the 11th of April, 1866, for the lease, the defendants were bound to have had ready a good unincumbered lease of the whole lands embraced in the subscription paper, to be quietly enjoyed by the lessees for any and all useful purposes, for the term of thirty years, free from the new conditions which were embraced in the instrument against the will of those who had paid their money.

We think the plaintiffs had waited a reasonable time to enable the de-

fendants to fulfil their contract, before the demand was made, and the right of action has now fully accrued to plaintiffs to recover the money by them paid. The delays granted to the defendants were at their request, and for their special accommodation. If the purchaser demand such a deed as the contract calls for, and the vendor refuse to give it, but insists on his receiving a different and inferior title, the contract may be regarded as broken, and the purchaser may sue at once and recover the money paid. *Foote* v. *West,* 1 Denio 544; *Baker* v. *Robins,* 2 Denio 136; *Camp* v. *Morse,* 5 Denio 161; *Lawrence* v. *Taylor,* 5 Hill 107; *Judson* v. *Waas,* 11 Johns. 140; *Little* v. *Paddleford,* 13 N. H. 167; *Swan* v. *Dudley,* 22 Pick. 485; Brown on the Statute of Frauds, sec. 122 and notes; *Fanar* v. *Nightingale,* 2 Esp. 630; *Shove* v. *Webb,* 1 Term. 732.

The cases clearly show that the right in the vendee of land under a parol contract to recover back what money he has advanced or paid, is confined to those cases where the vendor has refused, or become unable, to carry out the contract; the plaintiff himself having faithfully performed or offered to perform his part of the contract. The case *Fletcher* v. *Button,* 4 Comstock 319, shows the following facts: At the time of the execution of the covenant to convey, and for some time afterwards, the defendants' lands were incumbered by a heavy mortgage; and the defendants were unable to convey a good title, and on this ground neglected and refused, when a deed was demanded. It was held by the court, that the purchaser was released from his agreement. If a seller will not give an assurance, when reasonably demanded, he loses his bargain, and the purchaser is not bound to wait until he is able to convey. If the purchaser has paid his money, he may rescind the contract, and recover back the purchase money paid with the interest thereon. In such case the vendor holds the money without consideration. *Allen* v. *Webb,* 24 N. H. 278; 8 Johns. 257.

Under our view of the law of the case, applicable to the facts stated, we see no grounds for any presumption that the jury could be justified in finding the delivery of a valid lease to the lessees. The lease offered was not the one contracted for, and is found of no value to the plaintiffs. It is suggested that it should have been returned, with the subscription paper, to the defendants, before the action was brought.

These papers appear to us to be entirely worthless, except as evidence of the shadow of things not seen, at least by the plaintiffs. We are of the opinion they should be filed with the clerk of the court, to be preserved for the future use of those in interest. In *Perley* v. *Balch,* 23 Pick. 283, Chief Justice Shaw says, "that where the property is worthless, its return would be a useless ceremony which the law *never* requires." In *Thurston* v. *Blanchard,* 22 Pick. 18, the same judge remarks, that after the plaintiff claims to elect to rescind such contract as exists here, the obligation of contracts not assignable ceases to be binding and of any value, and of course need not be returned before the action is brought.

We are of the opinion that the ruling of the court in this case was right, and that there should be

*Judgment on the verdict.*